UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CONSOLIDATED WATER POWER COMPANY,

               Plaintiff,

      v.

0.46 ACRES OF LAND, MORE OR LESS, IN
PORTAGE COUNTY, WISCONSIN, ROBERT D.
MOODIE, and UNKNOWN OTHERS,

               Defendants.

Case No. 10-CV-397-bbc

---

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

Plaintiff Consolidated Water Power Company ("CWPCo") has operated the Stevens Point Hydropower Project (the "Project") on the Wisconsin River since 1926.  CWPCo acquired the 0.46 acres of land at issue in this action (the "Property") by warranty deed in 1929.  Under license from the Federal Power Commission ("FPC") and the Federal Energy Regulatory Commission ("FERC"), CWPCo has used the Property in an open and exclusive manner for at least 60 years to build and maintain a water retaining dike and an associated drainage ditch for power generation, environmental protection, and public recreation in furtherance of the Project.

One of the Defendants, Robert D. Moodie, recently challenged CWPCo's title to a portion of the Property and asserted his right to use the Property for his own purposes.  Accordingly, CWPCo filed this condemnation action under the Federal Power Act to confirm its ownership of the Property.  CWPCo now moves for summary judgment that CWPCo has a right to condemn the interests, if any, that Moodie and the other Defendants have in the Property and that the Defendants should be awarded nothing in just compensation.

The Federal Power Act grants the power of eminent domain to a "licensee" who is unable to acquire by contract property that is necessary for the operation of a FERC-licensed hydropower project.  Here, there is no question that FERC has licensed CWPCo to operate and manage the Project under the Federal Power Act, that the Property and the Project components, i.e. the dike and the ditch, located on the Property are necessary for the Project, and that CWPCo has unsuccessfully attempted in good faith to acquire the Property by contract.  CWPCo's right to condemn the Property cannot be reasonably disputed.

Defendants are entitled to just compensation equal to the loss in value of their respective properties as a result of the taking.  However, in this unusual case, the Defendants' collective condemnation award in this case should be $0.00 because the value of their respective properties after CWPCo's taking will have the same value as before the taking.  This is because even if CWPCo's title to the Property is defective, CWPCo nevertheless obtained ownership of the Property by adverse possession decades ago.  Since before 1951, CWPCo has exercised exclusive, notorious possession of the Property for use in connection with the Project, and has transformed the Property so that any reasonable observer would know that CWPCo claimed the Property as its own.  Such use and possession has remained continuous for at least 60 years, far longer than the 20 years required to establish adverse possession under Wis. Stat. § 893.25.  The Property is therefore owned by CWPCo, not the Defendants.  Because the Defendants will not suffer damages as a result of this condemnation, the just compensation award should be zero.[1]

In the event the Court does not find that CWPCo took title to the Property by adverse possession, CWPCo seeks, in the alternative, summary judgment that it holds a

---

[1] Although CWPCo does not rely on its recorded deed to the Property to establish title for purposes of this Motion, CWPCo does not waive its right to rely on the deed and present evidence of its perfected title in the Property at trial should the Court deny the Motion.

2

prescriptive easement to use the entire Property in connection with the Project.  In Wisconsin, a power company like CWPCo need only show that it used another's real estate to produce electricity for public consumption for at least 10 continuous years to claim a prescriptive easement over that real estate, which CWPCo easily satisfies.  *See* Wis. Stat. § 893.28(2).  Moreover, CWPCo may also claim a prescriptive easement in the Property because of its open and exclusive use of the Property in a manner hostile to the Defendants' property interests for a continuous 20-year period.  *See* Wis. Stat. § 893.28(1).  The trial of the case would then be limited to the issue of the difference in the value of the Property as encumbered by the prescriptive easement before condemnation, and the value after this condemnation is confirmed.

## FACTS

### Brief History and Overview of the Project

The origins of the Project pre-date Wisconsin statehood.  In 1846, the legislature for the Territory of Wisconsin authorized the construction of a dam and boom across the Wisconsin River near Stevens Point.  (Plaintiff's Proposed Finding of Fact ("PFOF") 11.)  *Consol. Water Power Co.*, 57 F.P.C. 238, 238-39 (1977).  The dam generated power to run millworks on adjacent land.  (PFOF 12.)  57 F.P.C. at 239.  In 1919, the Oneida Power Company purchased the dam, power site and facilities.  (PFOF 13.)  57 F.P.C. at 239.  That entity eventually became CWPCo, and CWPCo took control of the Project, including the power site and facilities, in 1926.  (PFOF 14.)  57 F.P.C. at 239; *Consol. Water Power Co.*, 14 F.P.C. 1000, 1001, *modified*, 14 F.P.C. 1114 (1955).

CWPCo furnishes electricity to the public.  (PFOF 2.)  The Project is operated exclusively by CWPCo and includes a 28-foot high concrete gravity dam, a powerhouse with six generating units, a 2,600-foot long earthen dike on the west embankment, a drainage ditch immediately upland of the earthen dike, generator leads, a substation, and other facilities.  (PFOF

3

16, 17.)  14 F.P.C. at 1001; 57 F.P.C. at 239; *Consol. Water Power Co.*, 104 F.E.R.C. ¶ 62,070, at page 64,196 (2003).

        CWPCo operates the Project under a series of licenses issued by FERC and its predecessor, the FPC.  (PFOF 15.)  The FPC issued CWPCo's original license for the Project on September 26, 1955, retroactive to January 1, 1938 (the "1938 License").  (PFOF 18.)  14 F.P.C. at 1002-03.  That license – referred to as a "major" license – expired on June 30, 1970.  (PFOF 19.)  57 F.P.C. at 239.  The FPC thereafter issued CWPCo annual licenses until January 17, 1977, when it issued a new major license valid through June 30, 2000 (the "1970 License"). (PFOF 20.)  57 F.P.C. at 244.  When that license expired, FERC again issued annual licenses until re-issuing CWPCo's major license on July 30, 2003 (the "2003 License").  (PFOF 21.)  104 F.E.R.C. at 64,195.  The 2003 License expires in 2033.  (PFOF 22.)  *See* 104 F.E.R.C. at 64,200.

        FERC requires CWPCo to "acquire title in fee or the right to use in perpetuity all lands, other than lands of the United States, necessary or appropriate for the construction, maintenance, and operation of the [P]roject."  (PFOF 23.)  FERC places very specific requirements on CWPCo's operation of the Project and use of Project lands.  CWPCo must maintain the Project's impoundment (the water retention facility above the dam) within the FERC license-mandated elevation.  (PFOF 24.)  104 F.E.R.C. at 64,202.  Also, CWPCo must prevent third parties from using or occupying any "[P]roject land or waters" unless "the proposed use and occupancy is consistent with the purposes of protecting and enhancing the scenic, recreational, and other environmental values of the [P]roject."  (PFOF 25.)  104 F.E.R.C. at 64,204.  To carry out that responsibility, CWPCo must own or control the use of all Project lands.  (PFOF 26)  CWPCo is, with certain exceptions, required to make (and has always made) Project lands available for public recreational use.  (PFOF 27.)  14 F.P.C. at 1002; 57 F.P.C. at

240-41; 104 F.E.R.C. at 64,198, 64,203.  Most importantly, CWPCo is required to maintain all Project structures, including those located on the Property, to standards set and subject to review by FERC.  (PFOF 29)

**The Defendants**

The Property is part of the Project's 2,600-foot west embankment located between the Clark Street bridge and the Project's dam.  (PFOF 30.)  It contains approximately 0.46 acres of land, comprised of submerged land, an earthen dike, a walking and biking trail across the top of the dike, and a drainage ditch.  (PFOF 5, 31.)

The Property includes two parcels of land.  The portion of the Property over which Moodie claims ownership (the "Moodie Parcel")[2] is a parallelogram-shaped parcel approximately 50 feet wide by 360 feet long, or approximately 0.407 acres.  (PFOF 32, 33.)  Moodie claims ownership of five lots totaling 5.083 acres of land between West Clark Street in Stevens Point and the Project's impoundment, which allegedly includes the Moodie Parcel.  (Answer at 2, ¶ 5.)  As will be explained below, CWPCo claims ownership of the Moodie Parcel by virtue of a 1929 deed.  (PFOF 91.)  However, if Moodie is correct that he owns the Moodie Parcel, then CWPCo's condemnation would constitute a partial taking of Moodie's property, leaving an approximately 4.676-acre remainder.[3]

The second parcel, a diamond-shaped piece of land approximately 0.059 acres in size (the "Anonymous Parcel"),[4] is or might be owned by unknown others (the "Unknown

---

[2] For a legal description of the Moodie Parcel, *see* PFOF 33.

[3] CWPCo reserves the right to challenge Moodie's claim as to the total acreage of his property. The actual acreage of Moodie's land is not material to this Motion, however, and CWPCo assumes that Moodie is correct for the purposes of this Motion.

[4] For a legal description of the Anonymous Parcel, *see* PFOF 38.

MADI_2427900

Others"). (PFOF 34.) CWPCo reviewed the title history of the Property back to the mid-19th century and obtained a commitment for title insurance in April of 2010 to identify the Unknown Others, but was unable to do so despite these efforts. (PFOF 35-37.) The Anonymous Parcel is part of an approximately 0.092-acre triangle-shaped sliver of land bordered to the west by an abandoned railroad spur, to the southeast by the Project's impoundment, to the east by the Moodie Parcel, and to the north by Moodie's lot. (PFOF 38.) As will be explained below, CWPCo believes that it owns the Anonymous Parcel by virtue of the same 1929 deed that conveyed the Moodie Parcel. However, if that deed is defective and CWPCo does not hold record title to the Anonymous Parcel, then CWPCo's condemnation of the Anonymous Parcel constitutes a partial taking of the Unknown Others' real property, leaving a 0.033-acre remainder.

**CWPCo's Use of the Property**

A portion of the Project's 2,600-foot long earthen dike runs the length of the Property and comprises all water frontage on the Property. (PFOF 39.) CWPCo (or one of its predecessors) built the dike sometime before 1951. (PFOF 40.) The dike is an essential component of the Project, as it is integral to safely maintaining the impoundment as prescribed by FERC. (PFOF 41.) CWPCo has performed regular inspections and maintenance of the dike since its construction, including:

- Regular inspection for erosion, seepage, and other damage or instability. (PFOF 42.)

- Removal of brush, weeds, trees and other vegetation, including almost every year prior to FERC's annual inspection of Project works, described *infra*. (PFOF 43.)

- Installing and maintaining riprap (large stones along the riverbank) and monitoring the riprap for effectiveness and vegetation growth. (PFOF 44.)

- Rooting out burrowing animals and backfilling animal holes. (PFOF 45.)

6

- Removing fallen trees and monitoring their effects.  (PFOF 46.)

- Monitoring the effects of floods, storms, and other weather conditions on the dike both during and after adverse weather events.  (PFOF 47.)

- Installing and utilizing piezometers (observation wells that monitor the elevation and pressure of the water that exists in the dike) and checking piezometric measurements on a monthly basis, resulting in frequent travel across the dike.  (PFOF 48.)

CWPCo constructed a drainage ditch on the Property sometime before 1951. (PFOF 49.)  The ditch runs parallel to and on the upland side of the dike along the northern border of the Property.  (PFOF 50.)  The ditch collects and transports seepage and storm water, protecting the integrity of the dike and preventing erosion.  (PFOF 51.)  CWPCo has performed regular inspections of and maintenance on the ditch since its initial excavation, including:

- Cleaning and removing vegetation from the ditch.  (PFOF 52.)

- Dredging the ditch, which occurred at least once.  (PFOF 53.)

- Reinforcing areas of the ditch affected by sloughing.  (PFOF 54.)

- Monitoring the contents and flow of the ditch.  (PFOF 55.)

The dike and ditch cover almost all of the Property.  (PFOF 85.)  A small portion of the Property is land submerged by the Project's impoundment.  (PFOF 86.)  Immediately north of the ditch is a tree line separating Moodie's property from the ditch.  (PFOF 56.)  The ditch is not visible from Moodie's adjacent property and there is no pathway through the trees from Moodie's property on to the Property.  (PFOF 57.)  A similar tree line separates the Property from adjacent land owned by the Unknown Others.  (PFOF 58.)

FERC has conducted annual inspections of the Project, including of the dike and ditch as they cross the Property, since at least 1979.  (PFOF 59.)  Prior to 1979, FERC and its predecessor, the FPC, inspected the Project every other year.  (PFOF 60.)  FERC's regular practice is – and has always been – to send a representative to the Property who, accompanied by

7

a CWPCo representative, observes and inspects all components of the Project, including the dike and ditch.  (PFOF 61.)  The FERC representative looks for signs of instability or impediments and, more important, verifies the safe and effective operation of the dike and ditch.  (PFOF 62.)  The FERC representative then drafts a report detailing the findings of the inspection and recommending or mandating courses of action.  (PFOF 63.)  Upon receiving the FERC report, CWPCo assesses FERC's recommendations, complies with any mandates, and, when necessary, submits a letter describing its actions or, for more significant or complicated issues, proposes a work plan for FERC review and approval, to address concerns identified by FERC.  (PFOF 64)

FERC also requires CWPCo to submit to safety inspections of the Project, including the dike and ditch, by a third party inspector approximately every five years.  (PFOF 65.)  The first such safety inspection was completed in 1968 and was followed by inspections in 1974, 1979, 1984, 1990, 1995, 2000, 2005, and 2010.  (PFOF 66.)  Following each safety inspection, the third party safety inspector generates a report detailing its findings and recommending specific courses of action, then submits the report to CWPCo and to the federal regulators.  (PFOF 67.)

Consistent with and as required by its FERC license, CWPCo allows public access to the dike and shoreline on the Property.  (PFOF 68.)  *See* 57 F.P.C. at 240-41; 104 F.E.R.C. at 64,198.  A gravel road running along the top of the dike is used both for the Project and as part of the City of Stevens Point's Green Circle Trail.  (PFOF 69.)  The gravel road was used for years in connection with the Project, specifically by CWPCo personnel conducting maintenance and inspections on the dike and ditch.  (PFOF 70.)  In 2001, CWPCo granted the City of Stevens Point an easement to include the gravel road on top of the dike as part of the Green Circle Trail, which the public uses for biking, jogging, and cross-country skiing.  (PFOF

MADI_2427900

71.)  The easement crosses both the Moodie Parcel and the Anonymous Parcel.  (PFOF 72.)  The Trail is lined with crushed red granite to facilitate the public's use of the trail for jogging, biking, cross-country skiing and other activities.  (PFOF 73.)  CWPCo posted a sign at the entrance to the Trail on West Clark Street, where the Trail connects with the dike, declaring the Trail open to the public.  (PFOF 74.)  The public uses the Trail for recreation year-round and at all times of day.  (PFOF 75.)  CWPCo maintains the Trail in conjunction with the City of Stevens Point so that the Trail will remain suitable for recreational activities.  (PFOF 76.)  CWPCo never sought permission from Moodie, the Unknown Others, or anyone else to grant the easement to the City or allow public access.  (PFOF 78.))

Other than this public right of way, CWPCo has had exclusive use of the Property since before 1951.  (PFOF 79)  Throughout this time, CWPCo has treated the Property as if it were the exclusive owner.  (PFOF 80.)  At no time has an adjacent landowner or any other party erected a permanent structure or enclosure on the Property, or otherwise interfered with Project operations on the Property.  (PFOF 81.)  CWPCo has never sought or received permission from any predecessor to Moodie or the Unknown Others to use the dike and ditch on the Property.  (PFOF 82.)  Nor did any party object to either CWPCo's use and ongoing maintenance of the dike or CWPCo's excavation, maintenance and use of the ditch.  (PFOF 83.)  CWPCo's 1938 License, 1970 License, and 2003 License each recognize that the dike and ditch are Project works, *i.e.* physical structures included and necessary for the safe and efficient operation of the Project.  (PFOF 84.)  14 F.P.C. at 1001; 57 F.P.C. at 239; 104 F.E.R.C. at 64,196, 64,200.

**Title History of the Property and the Dispute with Moodie**

The Property's complicated title history does not create issues of material fact on any of CWPCo's grounds for summary judgment in this condemnation action.  However, the Property's complicated title history provides context for this action.  There are two issues that

9

complicate the Property's title history.  First, both CWPCo and Moodie have Warranty Deeds

that encompass the Property.  Second, the description of the Property in Moodie's Warranty

Deed contains a surveying error.

There are two deeds from two different parties claiming and conveying title to the

Property.  On November 8, 1929, CWPCo acquired the Property by warranty deed from Stevens

Point Box & Lumber Company.  (PFOF 91.)[5]  For over five decades, CWPCo used and

maintained the Property in furtherance of the Project without any challenges to its title or

ownership.  (PFOF 125.)  CWPCo never had reason to doubt its title to the Property until 1999,

when Moodie first presented his deed to CWPCo as evidence of his ownership.  (PFOF 126.)

The surveying issue can be traced to an October 21, 1889 deed conveying the

parcel that contains the Moodie Parcel from William and Melanie Steffanus ("Steffanus") to

Nicholas and Catherine Jacobs.  (PFOF 95.)  In that deed, the legal description of the parcel that

contains the Moodie Parcel begins on the southern edge of the right-of-way for Central Avenue,

which is now West Clark Street.  (PFOF 96.)  By contrast, the legal description in the

predecessor deeds by which the Stevens Point Manufacturing Company ("SPMC") acquired the

Moodie Parcel in the mid-1880s begins at the center line of the road.  (PFOF 97.)[6]

---

[5] All deeds referenced herein constitute admissible evidence under Fed. R. Evid. 803(14).  Each
deed purports to convey an interest in real property and was recorded in the Office of the
Register of Deeds for Portage County, Wisconsin, which office is authorized by statute to record
deeds and keep a record of real estate conveyances.  *See* Wis. Stat. § 59.43(1)(a), (c).

[6] SPMC is one of CWPCo's predecessors in title to the Property.  (PFOF 92)  It acquired title to
the Property in two separate transactions: a September 18, 1885 conveyance from the estate of
Jared N. Avery and a November 19, 1887 conveyance from Steffanus.  (PFOF 93.)  SPMC then
quit-claimed to Steffanus a portion of the land it acquired in the 1885 sale on November 23,
1887.  (PFOF 94.)  The relevant legal description appears in the 1885 deeds.

MADI_2427900

As a result of this inconsistency, the Steffanus-to-Jacobs deed erroneously extended the southeastern border of the property conveyed therein by approximately 30 feet, i.e. the distance between the middle of the road and the southern edge of the Clark Street right of way.  (PFOF 98.)

In a series of real estate transactions between 1998 and 2001, Moodie acquired five parcels of land once included within the property that Steffanus sold to Jacobs in 1889. (PFOF 99.)  In total, he acquired approximately five acres.  (PFOF 100.)  Moodie claims that the Moodie Parcel was conveyed to him in the first of these transactions.  (PFOF 101.)  He first made this claim to CWPCo during a meeting in March or April 1999 at which he presented his deed and survey map as evidence of his ownership.  (PFOF 102.)  During this meeting, Moodie affirmatively stated that he believed he, not CWPCo, owned the Moodie Parcel and that he intended to construct a condominium complex on the land and develop the shoreline as a marina. (PFOF 103.)

At the time, CWPCo was involved in a dispute with another landowner claiming to own Project land.  (PFOF 104.)  That dispute eventually led to litigation, in which CWPCo quieted title in its favor.  (PFOF 105.)  Faced with Moodie's deed purporting to show yet another title dispute, and mindful of FERC's requirement that CWPCo own fee title to all Project lands or the right to use them in perpetuity, CWPCo offered to quit claim non-Project land to Moodie and grant him dock permits and ingress-easement rights on the Property's dike if Moodie would quit claim the Moodie Parcel to CWPCo.  (PFOF 106.)  CWPCo also informed Moodie that FERC was unlikely to allow him to develop a marina off the dike.  (PFOF 107.)  Moodie rejected CWPCo's offer, but took no steps to eject CWPCo from, or restrict its access to, the Moodie Parcel.  (PFOF 108.)

MADI_2427900

In 2007, CWPCo discovered that Moodie was moving forward to develop both his land and the Property.  (PFOF 109.)  CWPCo immediately informed Moodie that it owned the Moodie Parcel, that the Property contained essential components of the Project, and that it would resort to legal action if necessary to prevent Moodie from developing the Moodie Parcel. (PFOF 110.)  CWPCo again offered to swap land with Moodie and grant him dock rights and water access over the dike.  (PFOF 111.)  Moodie again refused.  (PFOF 112.)  He never developed the Property.  (PFOF 113.)

On July 17, 2009, following extensive negotiations, CWPCo offered to purchase the Moodie Parcel for $60,000.00.  (PFOF 114.)  As an alternative, CWPCo offered to purchase easement rights in the Moodie Parcel for $12,000.00.  (PFOF 115.)  Moodie rejected both offers. (PFOF 116.)  In a September 15, 2009 letter to CWPCo, Moodie made a counteroffer to either, (a) sell CWPCo all five of his acres, including the Moodie Parcel, for $1,600,000.00; (b) exchange the five acres for land or property of equal value; (c) sell CWPCo the .4-acre Moodie Parcel for $1,080,000.00; or (d) lease the Moodie Parcel for $6,000.00 per month, to be adjusted upward to account for "cost of living" increases.  (PFOF 117.)  Moodie's letter also stated that CWPCo "must seek permission from me before you enter my land," even to perform maintenance.  (PFOF 118.)  Moodie did not enclose an appraisal supporting his valuation of the land.  (PFOF 119.)

Moodie's September 15, 2009 letter was the first time that anyone attempted to bar CWPCo's entry upon or use of the Property.  (PFOF 120.)  Notwithstanding Moodie's demands, CWPCo has continued to enter upon and use the Property, including the Moodie Parcel, to operate the Project.  (PFOF 121).)

12

Because the Moodie Parcel is the only land to which Moodie claims ownership that is necessary to the operation of the Project (PFOF 122), and because the prices Moodie sought were well in excess of what CWPCo believed to be fair market value for the Moodie Parcel (PFOF 123), CWPCo rejected each of Moodie's counteroffers (PFOF 124).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law." *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010). "The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). The nonmoving part cannot "simply rest upon the pleadings," but must come forth with evidence showing a genuine issue of material fact, and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). A factual dispute is only "material" if the resolution of the dispute might change the outcome, and is only "genuine" if a reasonable jury, considering the evidence, could return a verdict for the nonmoving party. *Spivey*, 622 F.3d at 822. "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney*, 526 F.3d at 1104. Summary judgment is appropriate here because there is no genuine issue of material fact as to CWPCo's right to condemn the Property or the amount of just compensation it owes the Defendants.

## ARGUMENT

## I.   CWPCO HAS THE RIGHT TO CONDEMN THE PROPERTY.

CWPCo's condemnation authority arises from the Federal Power Act, 16 U.S.C. § 791 et seq., which provides, in pertinent part:

> When any licensee cannot acquire by contract or pledges an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in conjunction with any improvement which in the judgment of the commission is desirable and justified in the public interest for the purpose of improving or developing a water or waterways for the use or benefit of interstate or foreign commerce, it may acquire the same by the exercise of the right of eminent domain . . . .

16 U.S.C. § 814.  CWPCo has the right to condemn the Property if it can show: 1) that it is a "licensee"; 2) that the Property is a necessary part of the Project; and 3) that it "cannot acquire by contract or pledges" either the Property itself or the right to use the Property.[7]

CWPCo is a licensee under the Federal Power Act.  Congress granted FERC authority to issue licenses "for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient" to develop, transmit or use power "across, along, from, or in" navigable waters.  16 U.S.C. § 797(e).  The FPC first issued CWPCo a license for the Project on September 26, 1955, retroactive to January 1, 1938.  (PFOF 18.)  14 F.P.C. 1000.  The original license has been re-issued twice, most recently in 2003, and the current license remains in force through 2033.  (PFOF 20, 21.)  57 F.P.C. 238; 104 F.E.R.C. ¶ 62,070.

The Property is necessary to the operation of the Project.[8]  The Property is

---

[7] CWPCo recorded a Notice of Lis Pendens with respect to the Property on July 21, 2010. (PFOF 7.)

[8] CWPCo has not sought to condemn any other portion of Moodie's property because CWPCo's eminent domain power may only be exercised against "property for which there is an absolute and immediate need" and also "property which is reasonably necessary, and for which a need will probably exist within a reasonable time."  *Chapman v. Pub. Util. Dist. No. 1*, 367 F.2d 163, 168 (9th Cir. 1966).  The Moodie Parcel is the only portion of Moodie's property that is or will be necessary to the Project.  (PFOF 122.)

14

comprised almost entirely of the dike and ditch.  FERC has recognized in each of CWPCo's licenses that the dike and ditch are physical structures included in the Project.  (PFOF 84)  14 F.P.C. at 1001; 57 F.P.C. at 239; 104 F.E.R.C. at 64,196, 64,200.  Indeed, the Project could not operate properly or efficiently without either the dike or the ditch.  (PFOF 89.)  The dike is necessary to contain the waters of the Project's impoundment and maintain the impoundment at the FERC license-required elevation.  (PFOF 41.)  The ditch directs run-off and seepage away from the dike, ensuring the dike's integrity and preventing erosion.  (PFOF 51.)  Taking away either or both of these structures at any point in the Project, including at the Moodie Parcel or the Anonymous Parcel, would eliminate CWPCo's ability to maintain the Project's impoundment at the FERC required elevation, would cause flooding to adjacent upland property, and would severely frustrate many of the Project's purposes, including hydropower generation, public recreation, flood control, and fish and wildlife enhancement.  *See* 16 USC 803(j).  (PFOF 90.)

       CWPCo has not been able to acquire the Property by contract.  CWPCo need not show an "[a]bsolute inability to acquire the property" but "merely the failure of a *bona fide* effort to acquire the rights through contract."  *Marseille Hydro Power, LLC v. Marseilles Land and Water Co.*, 518 F.3d 459, 466 (7th Cir. 2008).  If the owner and licensee "cannot agree upon a fair price for the land and structures *the licensee wishes to use*," then the licensee may exercise its power of eminent domain under section 814."  *Jordan v. Randolph Mills, Inc.*, 716 F.2d 1053, 1055 (4th Cir. 1983) (emphasis added).  CWPCo attempted to acquire the fee interests it seeks in this action by entering into contracts with each affected landowner.  It attempted to negotiate a purchase of the Moodie Parcel on three occasions, but those negotiations collapsed because of Moodie's demands.  (*See* PFOF 106-108, 111-112, 114-118, 123, 124.)  CWPCo used

reasonably diligent efforts to identify the owners of the Anonymous Parcel, but was unable to do so, and therefore cannot acquire that parcel by "contract or pledges."  (PFOF 35-37.)

## II.    CWPCO'S ADVERSE POSSESSION RIGHTS IN THE PROPERTY LEAVE THE VALUE OF THE DEFENDANTS' RESPECTIVE PROPERTY INTERESTS UNCHANGED BY THE TAKING.

As discussed below, CWPCo contends that it holds title by adverse possession to the entire Property.  From the Defendants' standpoint, however, CWPCo seeks to partially condemn their respective properties, namely their interests, if any, in the Property.  This action is therefore framed as a partial taking of a fee simple interest in land for which the Defendants are entitled to just compensation.  In Wisconsin, just compensation for a partial taking is the greater of, (i) the fair market value of the condemned parcel; or (ii) the difference in value of the whole property immediately before and immediately after the condemnation.  *See* Wis. Stat. § 32.09(6).

The just compensation analysis must consider the state of title on the land taken. *Boston Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910) (Holmes, J.).  Just compensation "does not require a parcel of land to be valued as an unencumbered whole when it is not held as an unencumbered whole"; rather, the landowner should only be paid the value of what is taken.  *Id*.  *See also Volbrecht v. State Hwy. Comm'n*, 31 Wis. 2d 640, 647, 143 N.W.2d 429, 432 (1966) ("[j]ust compensation is what the owner has lost, not what the condemnor has gained"); *Marseilles Hydro Power*, 518 F.3d at 467 (citing *United States v. Miller*, 317 U.S. 369, 375 (1943)) ("[c]ompensation in eminent domain cases is only for the value lost to the owner, not the benefit gained by the condemnor").

CWPCo has been in exclusive and continuous possession and use of the Property since before 1951, and has excluded the Defendants and all of their predecessors-in-interest from the Property ever since.  Because CWPCo already owns the Property by adverse possession, the

16

Defendants will not lose anything of value as a result of the taking, and therefore should recover nothing in just compensation.

### A.      CWPCo Owns the Property By Adverse Possession.

In Wisconsin, anyone who holds real property "in uninterrupted adverse possession" for at least 20 years, either by themselves or in connection with their predecessors in interest, has a claim for title to the property by adverse possession.  Wis. Stat. § 893.25(1).  An adverse possession claim is relevant to the determination of just compensation.  *Pulvermacher Enters., Inc. v. Wis. Dep't of Transp.*, 166 Wis. 2d 234, 239, 479 Wis. 2d 217, 220 (Ct. App. 1991).  A valid adverse possession claim is probative of the value of the condemned property and is thus properly considered in a takings case as part of the just compensation owed to the landowner.  *Id.*

To establish adverse possession, the proponent must show: (a) that the adverse possessor is "in actual continued occupation under claim of title, exclusive of any other right"; and (b) that the real estate is "actually occupied" and either "[p]rotected by a substantial enclosure" or has been "[u]sually cultivated or improved."  Wis. Stat. § 893.25(2).  Section 893.25 codified the common law adverse possession analysis, under which a party claiming adverse possession will prevail if it can show that it used the property "in an open, notorious, visible, exclusive, hostile and continuous manner" for at least 20 years such that a "reasonably diligent landowner and the public" would believe that the adverse possessor claimed the land as its own.  *Harwick v. Black*, 217 Wis. 2d 691, 699, 580 N.W.2d 354, 357 (Ct. App. 1998).  CWPCo satisfies each of these requirements.

### Actual Occupation

"Actual occupancy means the ordinary use to which the land is capable and such as an owner would make of it.  Any actual visible means, which gives notice of exclusion from

17

the property to the true owner or to the public and of the defendant's domination over it, is

sufficient." *Burkhardt v. Smith*, 17 Wis. 2d 132, 138, 115 N.W. 2d 540, 544 (1962).  An adverse

possessor claiming title over an entire parcel need not "actually lay his hands, so to speak, upon

the entire lot and keep them there as if covering the premises with a mantle."  *Id.* at 138, 115

N.W.2d at 543.

       The *Burkhardt* decision bears close parallels with this case.  The defendant built a

cottage overlapping his own lot and an adjacent lot.  *Burkhardt*, 17 Wis. 2d at 135, 115 N.W.2d

at 542.  Over the course of 20 years, he dug a septic tank, cleared brush, seeded and reseeded

grass, planted trees, erected a swingset, and built a partial fence on the adjacent lot.  *Id.* at 135-

36, 115 N.W.2d at 542.  In an action to eject the defendant from the lot, the plaintiffs argued that

the defendant did not meet the "actual occupation" requirement because none of the acts

described above continued for the requisite 20-year period.  Rejecting this argument, the

Wisconsin Supreme Court concluded that the defendant's acts of ownership should be

considered in relation to each other and to the original intrusion rather than in a vacuum as

individual, unique events.  The defendant's various acts of occupancy, stated the Court,

collectively evidenced the defendant's "continuous and uninterrupted" use of the lot "in the usual

and ordinary way an owner would use the land surrounding his lake cottage" and thus "[could

not] be considered separately and without relation to each other."  *Id*. at  139, 136, 115 N.W.2d

at 544, 543.  The Court further held, again rejecting the plaintiffs' contention to the contrary, that

"[a]dverse possession without enclosure need not be characterized by a physical, constant,

visible occupancy or improved by improvements of every square foot of the land."  *Id*. at 137-38,

115 N.W.2d at 543.  The Court deemed the defendant's acts of building his cottage, clearing

brush, and planting and maintaining the grass on the adjacent lot, in combination with his general

MADI_2427900

use of the lot in "the ordinary use of which it was capable" sufficient to establish not only the boundary of his adverse claim but the defendant's actual occupancy of the entire lot. *Id*. at 137, 115 N.W.2d at 543.

Like the *Burkhardt* defendant, CWPCo actually occupies the entire Property. CWPCo has established and maintained permanent improvements on the Property that occupy the entire Property for over 60 years. The dike, the riprap, the Trail, the ditch, and the flooded property on the downstream side of the embankment all run the length of the Property, all are used as part of the Project, and collectively cover approximately 100 percent of the Property. (PFOF 85-87.) Each of these improvements have been permanently located on the Property in some form since before 1951. (PFOF 88.) CWPCo has also regularly inspected and maintained the Property since before 1951 (PFOF 42-48, 52-55, 76-77), and FERC has likewise conducted or required third parties to conduct numerous inspections of the Project works located on the Property (PFOF 59-67). All of these are ordinary uses of the Property in its capacity as industrial property used in the operation of a hydroelectric dam.

**<u>Hostility</u>**

A hostile act is one that is inconsistent with the landowner's property rights and is done "to claim exclusive right to property which one possesses physically, but not by record title." *Keller v. Morfeld*, 222 Wis. 2d 413, 420 n.3, 588 N.W.2d 79, 82 n.3 (Ct. App. 1998). "'Hostile intent' does not mean a deliberate, wilful, unfriendly animus." *Burkhardt*, 17 Wis. 2d at 139, 115 N.W.2d at 544. The adverse possessor need not make an "explicit declaration of hostility" or engage in "aggressive or malicious conduct" to take by adverse possession. *Keller*, 222 Wis. 2d at 420, 588 N.W.2d at 82. Rather, hostile intent is presumed by evidence of open, notorious, continuous and exclusive use of another's land. *Burkhardt*, 17 Wis. 2d at 139, 115

19

N.W. 2d at 544.  For example, in *Burkhardt*, the adverse possessor sufficiently planted his "flag of hostility" by building a cottage, clearing brush, and planting and maintaining the lawn on the disputed property.  *Burkhardt*, 17 Wis. 2d at 137, 115 N.W.2d at 543.  In *Keller*, the plaintiffs established hostility by planting trees and building a carport and fence on the disputed property and by their exclusion of the true owners, this following their predecessor's use of the disputed property for parking vehicles and storing materials owned by his business and his mowing and general maintenance of the property.  *See Keller*, 222 Wis. 2d at 421-22, 588 N.W.2d at 83.  And in *Leciejewski v. Sedlak*, the adverse possessor's construction of a fence, boathouse, and horse barn on the disputed property, without permission and to the exclusion of the true owners, satisfied the hostility requirement.  116 Wis. 2d 629, 636-37, 342 N.W.2d 734, 737-38 (1984).

　　　　CWPCo's "flag of hostility" has been planted on the Property for decades.  The ditch and dike were constructed some time before 1951 and have remained on the Property ever since.  (PFOF 40, 49, 88.)  CWPCo never received permission from any predecessor to Moodie or the Unknown Others to use or maintain the ditch and dike.  (PFOF 82.)  In addition, CWPCo's regular inspections of the dike and ditch, its running of equipment over the Property (PFOF 77), and its maintenance of the Property, all in an open, visible and notorious way, along with its general treatment of the Property as if it were the only owner (PFOF 80), makes its claim to the Property obvious to the reasonable observer.

　　　　CWPCo's granting an easement to the City of Stevens Point and opening the Property for use by the public also evidences CWPCo's flag of hostility.  CWPCo granted the easement for the Green Circle Trail to cross the dike along the west bank of the impoundment, including across the Property.  (PFOF 71.)  CWPCo has allowed the public to cross the Property on the Green Circle Trail since the easement was granted while maintaining its right to run its

20

own equipment and vehicles on the easement.  (PFOF 77.)  CWPCo has openly advertised that

its land is open to the public, posting a sign on West Clark Street declaring the trail open to the

public for recreation activities.  (PFOF 74.)  Members of the public use the trail for recreation

during all four seasons, at all times of day, in a manner that is open and obvious to the reasonable

observer.  (PFOF 75.)  And CWPCo helps to maintain the Trail for biking, jogging, and cross-

country skiing, among other activities.  (PFOF 76.)  CWPCo has never sought Moodie's

permission to do any of these things.  (PFOF 78.)

### Exclusivity

Exclusivity exists when the adverse possessor uses and controls the disputed

property while excluding the true owner from possession.  *Cuskey v. McShane*, 2 Wis. 2d 607,

610, 87 N.W.2d 497 (1958).  A "casual reentry" by the true owner does not destroy exclusivity.

*Otto v. Cornell*, 119 Wis. 2d 4, 7, 349 N.W.2d 703, 705 (Ct. App. 1984).  Rather, the adverse

possessor's exclusive possession can only terminate when the true owner makes "a substantial

and material interruption and a notorious reentry for the purpose of dispossessing the adverse

occupant."  *Id.* (citing *Frank C. Schilling Co. v. Detry*, 203 Wis. 109, 115, 233 N.W. 635

(1930)).

In *Otto*, the plaintiff maintained a fence at what he believed to be the southern

boundary of his lot, eventually replacing it with a line of trees.  *Otto*, 119 Wis. 2d at 6, 349

N.W.2d at 705.  When a survey later determined that the fence and treeline were on his

neighbor's lot, the plaintiff sued to establish title by adverse possession in the property up to the

treeline.  The court of appeals held that the plaintiff met the exclusivity requirement, finding that

neither the true owners nor their predecessors in interest made any "notorious reentry" or other

attempt to dispossess the plaintiff of the disputed property during the 20-year adverse possession

21

period, nor did they use the disputed property as a true owner would have.  *Id*. at 7-8, 349 N.W.

2d at 705.  Although the record showed that the true owners occasionally entered the disputed

property to rake leaves and play with their children, these were merely "casual reentries"

insufficient to destroy exclusivity.  *Id*. at 9, 349 N.W.2d at 706.  The plaintiff, stated the court,

did not need to enclose the disputed property more so than he did to establish exclusivity, and he

"was not required to be belligerent if his neighbors happened to step across a particular line."  *Id*.

*See also Burkhardt*, 17 Wis. 2d at 136-37, 115 N.W.2d at 543 (exclusivity established where

only adverse possessor and his family used the disputed property); *Keller*, 222 Wis. 2d at 421-22,

588 N.W.2d at 83 (adverse possessor who used disputed land for parking and storage, to the

complete exclusion of the true owner, established exclusivity).

        Like the *Otto* plaintiff, CWPCo has maintained continuous possession and use of

the Property to the exclusion of Moodie, the Unknown Others, and all predecessors in title since

before 1951.  (PFOF 16, 79.)  From before 1951 until 2009, CWPCo received no demands from

anyone claiming to be the true owner(s) of the Property to cease operations or to remove the

ditch and dike.  (PFOF 81, 83.)  Nor did any party take any affirmative action during that time to

reestablish possession of the Property, as is required to make a "notorious reentry."  (PFOF 81.)

Indeed, this would be true of any 20-year period between 1951 and Moodie's September 15,

2009 letter attempting to bar CWPCo's entry upon or use of the Property.  (PFOF 120.)  Further,

nobody, including any past or present adjacent landowner, has ever attempted to erect a structure

or enclosure on the Property, nor has anyone other than CWPCo made any permanent or regular

use of the Property.  (PFOF 79, 81.)  Any use of the Property by parties other than CWPCo since

1951 – other than as a recreation trail – would therefore be no more than "casual reentries"

MADI_2427900

similar to those made by the *Otto* defendants.  CWPCo was not obligated to keep its neighbors from "stepping across a particular line" in order to preserve its adverse possession.

The public's right to use the gravel road for recreational activities is part and parcel of CWPCo's license to use and ownership of the Property and therefore cannot destroy CWPCo's exclusive possession.  The FERC licenses issued to CWPCo always required that CWPCo reserve a portion of the property for public recreation and use.  (PFOF 27.)  14 F.P.C. at 1002; 57 F.P.C. at 240-41, 243; 104 F.E.R.C. at 64,198, 64,203-04.  In accordance with this FERC mandate, CWPCo opened the Property to the public as part of the Green Circle Trail in 2001.  (PFOF 71.)  The Trail extends beyond the Property to West Clark Street, where a sign marking the beginning of the Trail is located.  (PFOF 74.)  The West Clark Street sign informs the public in large, conspicuous lettering that the Trail, although open to the public, is owned and maintained exclusively by CWPCo for purposes of running the Project and at FERC's direction. (PFOF 74.)  No reasonable observer could conclude otherwise.

### Protection/Usual Cultivation or Improvement

Section 893.25(2) requires an "enclosure, cultivation, or improvement of the land."  *Leciejewski*, 116 Wis. 2d at 636, 342 N.W.2d at 737.  The complete exclusion of "outside interferences" is not required so long as the improvements sufficiently delineate "the boundaries of the adverse claim."  *Ill. Steel Co. v. Bilot*, 109 Wis. 418, 446, 85 N.W. 402, 406 (1901).  Nor must the "precise extent of an apparent hostile occupancy" be absolutely evident.  *Id.  See also Klinefelter v. Dutch*, 161 Wis. 2d 28, 467 N.W.2d 192 (Ct. App. 1991) (reaffirming the *Ill. Steel Co.* decision's analysis of the substantial enclosure requirement).  All the adverse possessor need show is that the property is "used in such manner as to indicate reasonably the extent of hostile invasion and conquest."  *Burkhardt*, 17 Wis. 2d at 139, 115 N.W.2d at 544.

The *Burkhardt* case is again instructive.  The Wisconsin Supreme Court found that the defendant's work on the land and yard surrounding his cottage – which, again, was built in part on his own property and in part on the adjacent lot – and his general use of the land "in the usual and ordinary way an owner would use the land surrounding his lake cottage" sufficiently indicated the boundaries of the defendant's adverse claim.  *Id.*  So although the *Burkhardt* defendant erected a small, incomplete fence, it was his other, less obvious improvements that established his open, notorious, exclusive possession.  *See also Keller*, 222 Wis. 2d at 422, 588 N.W.2d at 83 (power line "provided a 'visible means' of demarcation" of the boundary of the defendant's adverse claim); *Otto*, 119 Wis. 2d at 8-9, 349 N.W.2d at 706 (line of ornamental trees, combined with adverse possessor's use and maintenance of land up to and around the trees, provided sufficient notice of the boundary of adversely held property).

CWPCo's improvements, unlike most of those in *Burkhadt*, are permanent and obvious: they include the dike, the ditch, the riprap, the gravel road, and the property flooded by the Project's impoundment.  There is nothing subtle or ambiguous about constructing and maintaining a dike and ditch and flooding another's property.  And these improvements plainly establish the definitive boundaries of CWPCo's adverse claim.  The riprap, dike, Trail, ditch, and flooded land on the Property give notice of CWPCo's claim to ownership of the land on which those improvements sit.  Further, the positioning of the ditch running along the northern border of the Property, coupled with the thick grove of trees creating a natural barrier between the ditch and both Moodie's land and the Unknown Others' land (PFOF 56-58), leaves no doubt that CWPCo claims all land on the Property.

24

### Continuity

Finally, CWPCo's actual, hostile, exclusive possession of the Property continued uninterrupted for at least twenty years.  The twenty-year period need not immediately precede the lawsuit claiming title.  Rather, "any twenty-year time period" of open, hostile, and exclusive use "is sufficient to establish title in the adverse possessor.  *Harwick*, 217 Wis. 2d at 701, 580 N.W.2d at 358.  Further, any adverse possession by the claimant's predecessors may be "tacked on" to that of the claimant when calculating the adverse possession period.  *Lindl v. Ozanne*, 85 Wis. 2d 424, 270 N.W.2d 249 (Ct. App. 1978) (citing *Mielke v. Dodge*, 135 Wis. 388, 115 N.W.2d 1099 (1908)).  "At the end of the applicable adverse possession period, title vests in the adverse possessor and the record owner's title is extinguished."  *O'Neill v. Reemer*, 2003 WI 13, ¶ 30, 259 Wis. 2d 544, 657 N.W.2d 403.

CWPCo easily satisfies the continuity requirement.  The Property has been an integral part of CWPCo's operations since some time before 1951.  CWPCo has made regular and exclusive use of the dike and the ditch ever since.  Nobody has ever interrupted CWPCo's exclusive possession.  Any reasonable owner – including Moodie at the time he purchased the Moodie Property – would have had ample notice of CWPCo's claim in 1951 if not earlier and through the present.

### Summary

CWPCo has occupied the Property in an open, visible, notorious, hostile and continuous manner since before 1951.  Because any title the Defendants may have held to the Property was lost when CWPCo took the Property by adverse possession, their respective properties will not lose any value as a result of CWPCo's taking.  The Court should therefore hold as a matter of law that the Defendants should receive nothing in just compensation.

MADI_2427900

**B.     Alternatively, CWPCo Holds a Prescriptive Easement to Use the Entire Property Exclusively for the Project.**

Assuming, without conceding, that CWPCo did not acquire title to the Property by adverse possession, CWPCo nevertheless holds a prescriptive easement to use the Property in furtherance of the Project.  Section 893.28, Wis. Stats., creates two scenarios under which an adverse user may acquire a prescriptive easement.  CWPCo satisfies both scenarios.

**1.     CWPCo holds a prescriptive easement under Wis. Stat. § 893.28(2).**

CWPCo, as a power company, need only show ten years of continuous use of the Property to establish its prescriptive easement rights.  Under Wisconsin law:

> [c]ontinuous use of rights in real estate of another for at least 10 years by a domestic corporation organized to . . .  transmit heat, power or electric current to the public or for public purposes . . . establishes the prescriptive right to continue the use . . . .

Wis. Stat. § 893.28(2).  This statute does not require CWPCo to show an *adverse* use of the Property; it is sufficient that CWPCo show continuous use – even if its use was permissive – for at least ten years.  *Williams v. Am. Transmission Co.*, 2007 WI App 246, ¶¶ 9-10, 306 Wis. 2d 181, 742 N.W.2d 882, *review denied* 2008 WI 19, 307 Wis. 2d 295, 746 N.W.2d 812.  CWPCo has put the Property to continuous, uninterrupted use as part of the Project since before 1951.  By the plain language of section 893.28(2), CWPCo holds a prescriptive easement over the Property.

**2.     In the alternative, CWPCo holds a prescriptive easement under Wis. Stat. § 893.28(1).**

For parties other than power companies, "[c]ontinuous adverse use of rights in real estate of another for at least 20 years . . . establishes the prescriptive right to continue the use." Wis. Stat. 893.28(1).  The proponent of a prescriptive easement must show an adverse use of the property that is: 1) "hostile and inconsistent" with the owner's right of possession; 2) "visible, open and notorious;" 3) "under an open claim of right;" and 4) "continuous and

uninterrupted for twenty years." *Draeger v. Gutzdorf*, 159 Wis. 2d 596, 598, 465 N.W.2d 204, 205 (Ct. App. 1990) (quoting *Mushel v. Town of Molitor*, 123 Wis. 2d 136, 144, 365 N.W.2d 622, 626 (Ct. App. 1985)). "[U]se of an easement for twenty years, if unexplained or uncontradicted, is presumed to be adverse and under a claim of right." *Id*. Once this presumption attaches, the burden shifts to the landowner to prove that it permitted the adverse use of the easement "under some license, indulgence, or special contract inconsistent with the claim of right by the other party." *Shellow v. Hagen*, 9 Wis. 2d 506, 510, 101 N.W.2d 694, 696 (1960) (quoting *Carmody v. Mulrooney*, 87 Wis. 552, 553-54, 58 N.W. 1109, 1110 (1894)).

CWPCo holds a prescriptive easement over the Property for many of the same reasons it holds title to the Property by adverse possession. CWPCo's use of the Property is entirely inconsistent with the Defendants' alleged rights of use and possession and CWPCo has completely excluded the Defendants – as it did with their predecessors in title – from use of the Property for their own designs. Nor does Moodie's – or any of his predecessor's – failure to halt or interfere with CWPCo's use of the Property mean that CWPCo had permission to use the Property as it did. "Mere acquiescence" to an adverse use does not destroy the adverse character of that use. *Red Star Yeast and Prods. Co. v. Merch. Corp.*, 4 Wis. 2d 327, 337-38, 90 N.W.2d 777, 783 (1958).

CWPCo has used the Property in an open, visible and notorious way since before 1951. No reasonable observer could conclude that CWPCo did not claim at least a right to use the Property for the Project. This use has been continuous for at least 60 years. Whether the adverse use was continuous "depends on the nature and the character of the right claimed. Such acts need not be constant, daily, or weekly." *Shellow*, 9 Wis. 2d at 512, 101 N.W.2d at 697. CWPCo personnel regularly walk and run equipment along the dike and ditch to inspect for

maintenance issues, conduct annual inspections with FERC representatives, upgrade the riprap and red granite as needed, and perform any necessary maintenance to the dike, ditch, gravel road, or grassy areas.  These activities are consistent with the nature of CWPCo's use of the Property and are dictated by specific needs inherent to that use.

> **3.     CWPCo's Prescriptive Easement Includes Virtually All Rights In the Property.**

Should the Court determine that CWPCo acquired a prescriptive easement over the Property but not adverse possession rights thereto, the court must then determine the rights CWPCo acquired and those retained by the Defendants.   The Wisconsin Supreme Court endorsed the following characterization of prescriptive easements from the *American Law of Property* treatise:

> The scope of an easement created by prescription is necessarily limited to some extent by the use which created it.  It is out of that use that the right acquired by prescription arose.  *The right acquired is to continue to do the things the doing of which resulted in the creation of the easement.*  Yet the exact repetition of the acts which lead to the creation of a prescriptive easement is impossible. A prescriptive easement must permit the making of uses similar to those which produced it or there could be no prescriptive easement.  The uses which result in a prescriptive easement furnish a pattern for the uses permissible under the easement rather than exact parallels for them.

*Red Star Yeast and Prods. Co. v. Merchandising Corp.*, 4 Wis. 2d 327, 339, 90 N.W.2d 777, 783 (1958) (court's emphasis).

CWPCo has been using the entire Property for Project purposes for over 60 years. Accordingly, CWPCo's prescriptive easement grants it all or virtually all of the use rights in the Property.  Under its prescriptive easement, CWPCo holds the right to use the Property to advance the purposes of the Project, including for environmental protection and for public recreational use (PFOF 127); to clear and dispose of "all temporary structures, unused timber,

28

brush, refuse, or other materials unnecessary for the purposes of the [P]roject which result from maintenance, operation, or alteration of the [P]roject works" (PFOF 128); to allow or prohibit non-Project activities on the Property (PFOF 129); to grant easements across the Property, as it did to the City of Stevens Point (PFOF 130); to prohibit outside parties from erecting structures on, excavating, or otherwise developing the Property (PFOF 131); to grant or prohibit shore access by adjacent landowners (PFOF 132); to open the Property to use by the public without notice to or permission from any servient estate owner (PFOF 133); and to access the Property for Project-related purposes without notice to or permission from any servient estate owner, including to inspect, perform maintenance on, and improve the Property as necessary (PFOF 134).[9] *See* 14 F.P.C. at 1002; 57 F.P.C. at 246 (incorporating F.P.C. Form L-5); 104 F.E.R.C. at 64,201, 64,204-05. Simply put, neither Moodie nor the Unknown Others can do anything on the Property without CWPCo's permission, and CWPCo need not seek permission from Moodie or the Unknown Others to perform Project activities on the Property.

Nonetheless, because the scope of a prescriptive easement is not, as a matter of law, coterminous with the fee simple interest that CWPCo seeks to condemn in this action, CWPCo recognizes that, should the Court find that CWPCo's precondemnation rights to the Property are in the nature of an easement rather than fee title, the proper course is for the Court to define the Parties' respective pre-condemnation rights in the Property and set the just compensation issue for trial.

---

[9] Further, a federal hydropower licensee that does not hold fee title to property necessary for Project works or operations must have the "right to perform any and all acts required by order of the Federal Energy Regulatory Commission . . . without the prior approval" of the property owner. *See, e.g.,Linweave, Inc.*, 23 F.E.R.C. ¶ 61,391 (1983).

## CONCLUSION

For these reasons, the Court should grant CWPCo's Motion for Summary Judgment as follows:

     A.  That CWPCo is entitled to condemn a fee simple interest in the Property under the Federal Power Act; and

     B.  That CWPCo's adverse possession rights in the Property are such that the just compensation owed Defendants arising out of this condemnation is zero; or, in the alternative;

     C.  That CWPCo has prescriptive easement rights in the Property as found by the Court and that the amount of just compensation owed Defendants arising out of this condemnation shall be determined at trial.

Dated: January 3, 2011.               Respectfully submitted,

                             /s/ Allen A. Arntsen
                             Allen A. Arntsen, WI Bar No. 1015038
                             Douglas B. Clark, WI Bar No. 1003658
                             Matthew D. Lee, WI Bar No. 1061375
                             **FOLEY & LARDNER LLP**
                             Verex Plaza
                             150 East Gilman Street
                             Madison, WI 53703-1481
                             Post Office Box 1497
                             Madison, WI 53701-1497
                             608.257.5035 (Telephone)
                             608.258.4258 (Facsimile)

                             *Attorneys for Plaintiff Consolidated Water*
                             *Power Company*

MADI_2427900