UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CONSOLIDATED WATER POWER COMPANY,

        Plaintiff,

v.

0.46 ACRES OF LAND, MORE OR LESS, IN
PORTAGE COUNTY, WISCONSIN, ROBERT D.
MOODIE, and UNKNOWN OTHERS,

        Defendants.

Case No. 10-CV-397-bbc

---

**PLAINTIFF'S PROPOSED FINDINGS OF FACT
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Consolidated Water Power Company ("CWPCo") proposes the following findings of fact in support of its Motion for Summary Judgment in the above-captioned matter:

### THE PARTIES

1. Plaintiff CWPCo is a Wisconsin corporation with its principal place of business at 610 High Street, Wisconsin Rapids, Wisconsin 54495. (Complaint, Dkt. 1, ¶ 1.)

2. CWPCo furnishes electricity to the public. (Declaration of Thomas J. Witt ("Witt Decl.") ¶ 7).

3. Defendant Robert D. Moodie ("Moodie") is an adult individual who resides at 2401 Rainbow Drive, Plover, Wisconsin 54467. (Complaint, Dkt. 1, ¶ 2; Reply to Notice of Condemnation ("Answer"), Dkt. 7, at 4.)

4. CWPCo filed this civil action for the taking of certain property, through the power of eminent domain as authorized by the Federal Power Act, 16 U.S.C. § 791a, et seq., and for the ascertainment and award of just compensation to the owners of the property and parties of interest. (Complaint, Dkt. 1, ¶ 2.)

5. CWPCo seeks to acquire by eminent domain two adjacent parcels of land totaling approximately 0.46 acres (the "Property"). (*Id.* ¶ 2; Witt Decl. ¶ 4, Exh. A, ¶ 5.)

6. Moodie was served with a Notice of Condemnation on July 20, 2010. (Affidavit of Service, Dkt. 5.)

7. CWPCo recorded a Notice of Lis Pendens with respect to the Property on July 21, 2010. (Declaration of Matthew D. Lee ("Lee Decl.") ¶ 9, Exh. H.)

## JURISDICTION

8. Because this is a condemnation action arising under the Federal Power Act, 16 U.S.C. § 814, and because the amount claimed by Moodie exceeds $3,000.00, the Court has subject matter jurisdiction over this matter. (Complaint, Dkt. 1, ¶ 5; Witt Decl. ¶ 48, Exh. K.)

9. Moodie is a citizen of Wisconsin, and therefore the Court has personal jurisdiction over him. (*Id.* ¶ 3.)

10. The Property is located in Portage County, Wisconsin, which is within this district, and therefore venue is proper in this Court pursuant to 28 U.S.C. § 1391. (*Id.* ¶ 5.)

## CWPCO'S FEDERAL LICENSES TO OPERATE THE STEVENS POINT HYDROPOWER PROJECT

11. In 1846, the legislature for the Territory of Wisconsin authorized the construction of a dam and boom across the Wisconsin River near Stevens Point. (Declaration of Max O. Andrae ("Andrae Decl.") ¶ 6, Exh. B at 1.)

12. The dam generated power to run millworks on adjacent land. (Andrae Decl. ¶ 6, Exh. B at 1.)

13. In 1919, the Oneida Power Company purchased the dam, power site and facilities and began operating what is now known as the Stevens Point Hydropower Project (the "Project"). (*Id.*)

14. The Oneida Power Company eventually became CWPCo, and CWPCo took control of the Project, including the power site and facilities, in 1926. (*Id.* ¶ 5, Exh. A at 1, ¶ 6, Exh. B at 1.)

15. CWPCo operates the Project under a series of licenses issued by the Federal Energy Regulatory Commission ("FERC") and its predecessor, the Federal Power Commission ("FPC"). (Andrae Decl. ¶ 5, Exh. A, ¶ 6, Exh. B; Witt Decl. ¶ 7, Exh. C.)

16. CWPCo is the exclusive licensee for the Project. (*See generally* Andrae Decl. ¶ 5, Exh. A, ¶ 6, Exh. B; Witt Decl. ¶ 7, Exh. C.)

17. The Project's components include a 28-foot high concrete gravity dam, a powerhouse with six generating units, a 2,600-foot long earthen dike on the west embankment, a drainage ditch immediately upland of the earthen dike, generator leads, a substation, and other facilities. (Andrae Decl. ¶ 5, Exh. A at 1-2, ¶ 6, Exh. B at 2; Witt Decl. ¶ 7, Exh. C at 2.)

18. The FPC issued CWPCo's original license for the Project on September 26, 1955, retroactive to January 1, 1938 (the "1938 License"). (Andrae Decl. ¶ 5, Exh. B at 4-5.)

19. The 1938 License – referred to as a "major" license – expired on June 30, 1970. (Andrae Decl. ¶ 6, Exh. B at 2.)

20. The FPC thereafter issued CWPCo annual licenses until January 17, 1977, when it issued a new major license valid through June 30, 2000 (the "1970 License"). (*Id.* ¶ 6, Exh. B at 2, 10-11.)

MADI_2497075

21. When the 1970 License expired, FERC again issued annual licenses until re-issuing CWPCo's major license on July 30, 2003 (the "2003 License"). (Witt Decl. ¶ 7, Exh. C at 1.)

22. The 2003 License expires in 2033. (*Id*. ¶ 7, Exh. C at 12.)

23. The FERC License requires CWPCo to "acquire title in fee or the right to use in perpetuity all lands, other than lands of the United States, necessary or appropriate for the construction, maintenance, and operation of the [P]roject." (Andrae Decl. ¶ 6, Exh. B at 18; *see also* Andrae Decl. ¶ 5, Exh. A at 18-19 (same) *and* Witt Decl. ¶ 7, Exh. C at 15 (incorporating this requirement by reference).)

24. CWPCo must maintain the Project's impoundment (the water retention facility above the dam) at the FERC license-mandated elevation. (Witt Decl. ¶ 7, Exh. C at 17.)

25. CWPCo must prevent third parties from using or occupying any "[P]roject land or waters" unless "the proposed use and occupancy is consistent with the purposes of protecting and enhancing the scenic, recreational, and other environmental values of the [P]roject." (*Id*. at 21.)

26. To carry out that responsibility, CWPCo must own or control the use of all Project lands. (Andrae Decl. ¶ 6, Exh. B at 18; Witt Decl. ¶ 8; Declaration of Mark Anderson ("Anderson Decl.") ¶ 39.)

27. CWPCo is, with certain exceptions, required to make (and has always made) Project lands available for public recreational use. (Andrae Decl. ¶ 5, Exh. A at 3, 10, ¶ 6, Exh. B at 4-5, 9, 23; Witt Decl. ¶ 7, Exh. C at 9, 19-21.)

MADI_2497075

28. FERC has recognized in each of CWPCo's licenses that the dike is physical structure included in the Project. (Andrae Decl. ¶ 5, Exh. A at 1, ¶ 6, Exh. B at 2, 11-12; Witt Decl. ¶ 7, Exh. C at 13-14.)

29. CWPCo is required to maintain all Project structures, including those located on the Property, to standards set and subject to review by FERC. (Andrae Decl. ¶ 5, Exh. A at 7-8, ¶ 6, Exh. B at 17-18; Witt Decl. ¶ 7, Exh. C at 15 (incorporating this requirement by reference), ¶ 9.)

**CWPCO'S USE OF THE PROPERTY IN FURTHERANCE OF THE PROJECT FOR AT LEAST THE PAST SIXTY YEARS**

30. The Property sits along the west bank of the Project's impoundment, between the Clark Street bridge and the Project's dam. (Witt Decl. ¶¶ 3, 5.)

31. The Property is comprised of submerged land, an earthen dike, a walking and biking trail across the top of the dike, and a drainage ditch. (*Id.* ¶¶ 4, 5.)

32. Moodie claims to own a portion of the Property. (Answer, Dkt. 7, at 1-2.)

33. The portion of the Property over which Moodie claims ownership (the "Moodie Parcel") is a parallelogram-shaped parcel approximately 50 feet wide by 360 feet long, or approximately 0.407 acres, with a legal description as follows:

> Commencing at the SW COR. Of Lot 3 of Portage County Certified Survey Map No. 3004, said point being the POINT OF BEGINNING; Thence N 35°49'52" W, a distance of 52.86' to an iron monument; Thence N 35°26'02" W, a distance of 7.37'; Thence N 13°06'07" E, a distance of 78.89'; Thence N 22°11'04" E, a distance of 172.03; Thence N 13°10'26" E, a distance of 92.74'; Thence S 21°30'00" E, a distance of 95.43'; Thence S 19°54'12" W, a distance of 304.70' being the POINT OF BEGINNING; subject to right-of-ways, easements, restrictions and reservations of record, IF ANY.

(*See* Witt Decl. ¶ 4, Exh. A.)

5

34. The Property also includes a diamond-shaped piece of land approximately 0.059 acres in size (the "Anonymous Parcel") that is or might be owned by unknown others (the "Unknown Others"). (*Id*. ¶ 4, Exh. A.)

35. CWPCo reviewed the title history of the Property back to the mid-19th century as part of its effort to identify the Unknown Others. (*Id*. ¶ 45.)

36. CWPCo also obtained a commitment for title insurance in April of 2010 as further effort to identify the Unknown Others. (Lee Decl. ¶ 8, Exh. G.)

37. Despite these efforts, CWPCo remains unable to identify the Unknown Others. (Witt Decl. ¶ 45.)

38. The Anonymous Parcel is part of an approximately 0.092-acre triangle-shaped sliver of land bordered to the west by an abandoned railroad spur, to the southeast by the Project's impoundment, to the east by the Moodie Parcel, and to the north by Moodie's lot, and bears the following legal description:

> Commencing at the SW COR of Lot 3 of Portage County Certified Survey Map No. 3004, said point being the POINT OF BEGINNING; Thence S 19°54'12" W, a distance of 72.58' to the East Line of the Wisconsin Central Spur Railroad Right of Way; Thence along a curve to the left, whose chord bears N 15°12'26" W, for a distance of 77.56'; Thence N 13°06'07" E, a distance of 43.39'; Thence S 35°26'02" E, a distance of 7.37' to an iron monument; Thence S 35°49'52" E, a distance of 52.86' being the POINT OF BEGINNING; subject to right-of-ways, easements, restrictions and reservations of record, IF ANY.

(*See id*. ¶ 4, Exh. A.)

39. A portion of the Project's 2,600-foot long earthen dike runs the length of the Property and comprises all water frontage on the Property. (*Id*. ¶ 11.)

40. CWPCo (or one of its predecessors) built the dike sometime before 1951. (Andrae Decl. ¶ 12.)

MADI_2497075

41. The dike is an essential component of the Project, as it is necessary to contain the waters of the Project's impoundment at the elevation required by the FERC license. (Witt Decl. ¶ 13; Declaration of Kenneth K. Knapp ("Knapp Decl.") ¶ 6.)

42. Since before 1951, CWPCo has regularly inspected the dike, including the portion of the dike crossing the Property, for erosion, seepage, and other damage or instability. (Andrae Decl. ¶¶ 15, 16; Knapp Decl. ¶¶ 10, 15; Anderson Decl. ¶¶ 14, 21; Witt Decl. ¶ 14.)

43. Since before 1951, CWPCo has regularly removed brush, weeds, trees and other vegetation from the dike, including from the portion of the dike crossing the Property, and in addition to its routine performance of this work CWPCo clears vegetation from the dike almost every year prior to FERC's annual inspection of Project works to help facilitate the inspection. (Andrae Decl. ¶ 18; Knapp Decl. ¶¶ 12, 20; Anderson Decl. ¶ 18; Witt Decl. ¶ 15.)

44. Since before 1951, CWPCo has installed and maintained riprap – large stones along the riverbank – to ensure the stability of the dike, including the portion of the dike crossing the Property, and monitors the riprap regularly for effectiveness and vegetation growth. (Andrae Decl. ¶¶ 17, 18; Knapp Decl. ¶ 12, 13; Anderson Decl. ¶ 17; Witt Decl. ¶ 16.)

45. Since before 1951, CWPCo has rooted out burrowing animals and backfilled animal holes on the dike, including on the portion of the dike crossing the Property, on an as-needed basis. (Andrae Decl. ¶ 18; Knapp Decl. ¶ 12; Witt Decl. ¶ 17.)

46. Since before 1951, CWPCo has removed fallen trees from the dike and monitored their effects on the stability of the dike, including on the portion of the dike crossing the Property. (Andrae Decl. ¶ 18; Knapp Decl. ¶ 12; Witt Decl. ¶ 17.)

47. Since before 1951, CWPCo has monitored the effects of floods, storms, and other weather conditions on the dike, including on the portion of the dike crossing the

MADI_2497075

Property, both during and after adverse weather events. (Andrae Decl. ¶ 16; Knapp Decl. ¶ 15; Anderson Decl. ¶¶ 15-16; Witt Decl. ¶ 14.)

48. Since at least 1988, CWPCo has installed and used piezometers – observation wells that monitor the elevation and pressure of groundwater inside the dike – on the dike, including on the portion of the dike crossing the Property, and CWPCo personnel routinely check piezometric measurements on a monthly basis, resulting in frequent travel across the dike. (Knapp Decl. ¶ 11; Anderson Decl. ¶ 20; Witt Decl. ¶ 18.)

49. The drainage ditch was constructed on the Property sometime before 1951. (Andrae Decl. ¶ 12.)

50. The ditch runs parallel to and on the upland side of the dike along the northern border of the Property. (Witt Decl. ¶ 28, ¶ 4, Exh. A.)

51. The ditch collects and transports seepage and storm water, protecting the integrity of the dike and preventing erosion. (Andrae Decl. ¶ 10; Knapp Decl. ¶ 7; Anderson Decl. ¶ 10; Witt Decl. ¶ 29.)

52. Since before 1951, CWPCo has cleaned and removed vegetation from the ditch as needed, including from the portion of the ditch crossing the Property. (Andrae Decl. ¶ 19; Knapp Decl. ¶ 14; Anderson Decl. ¶ 22; Witt Decl. ¶ 30.)

53. CWPCo has dredged the ditch at least once. (Anderson Decl. ¶ 22.)

54. Since before 1951, CWPCo has reinforced areas of the ditch affected by sloughing as needed, including the portion of the ditch crossing the Property. (Andrae Decl. ¶ 19; Knapp Decl. ¶ 14; Anderson Decl. ¶ 23; Witt Decl. ¶ 31.)

MADI_2497075

55. Since before 1951, CWPCo has frequently monitored the contents and flow of the ditch, including the flow in the portion of the ditch crossing the Property. (Andrae Decl. ¶ 19; Knapp Decl. ¶ 14; Anderson Decl. ¶ 24.)

56. Immediately north of the ditch is a tree line separating Moodie's property from the ditch. (Witt Decl. ¶ 32, Exh. G.)

57. The ditch is not visible from Moodie's adjacent property and there is no pathway through the trees from Moodie's property on to the Property. (*Id.*)

58. A similar tree line separates the Property from adjacent land owned by the Unknown Others. (*Id.* ¶ 33, Exh. H.)

59. FERC has conducted annual inspections of the Project, including of the dike and ditch as they cross the Property, since at least 1979. (Andrae Decl. ¶ 23; Knapp Decl. ¶¶ 18, 19; Anderson Decl. ¶ 29; Witt Decl. ¶ 34.)

60. Prior to 1979, FERC (and its predecessor, the FPC) inspected the Project every other year. (Andrae Decl. ¶¶ 20-22.)

61. FERC's regular practice is – and has always been – to send a representative to the Property who, accompanied by a CWPCo representative, observes and inspects all components of the Project, including the dike and ditch. (Andrae Decl. ¶¶ 20-21; Knapp Decl. ¶ 18; Anderson Decl. ¶ 29; Witt Decl. ¶ 35.)

62. The FERC representative looks for signs of instability or impediments and, more important, verifies the safe and effective operation of the dike and ditch. (Andrae Decl. ¶ 21; Knapp Decl. ¶ 18; Anderson Decl. ¶ 29; Witt Decl. ¶ 36.)

MADI_2497075

63. The FERC representative then drafts a report detailing the findings of the inspection and recommending or mandating courses of action. (Andrae Decl. ¶ 23; Knapp Decl. ¶ 21; Anderson Decl. ¶ 30; Witt Decl. ¶ 37).)

64. Upon receiving the FERC report, CWPCo assesses FERC's recommendations, complies with any mandates, and, when necessary, submits a letter describing its actions or, for more significant or complicated issues, proposes a work plan for FERC review and approval, to address concerns identified by FERC. (Andrae Decl. ¶¶ 24, 25, Exh. C; Knapp Decl. ¶¶ 22, 23, Exh. A; Anderson Decl. ¶¶ 31, 32, Exh. A; Witt Decl. ¶¶ 38, 39, Exh. I.)

65. FERC also requires CWPCo to submit to safety inspections of the Project, including the dike and ditch as they cross the Property, by a third party inspector approximately every five years. (Andrae Decl. ¶ 26; Knapp Decl. ¶ 24; Anderson Decl. ¶ 33; Witt Decl. ¶ 40.)

66. The first such safety inspection was completed in 1968 and was followed by inspections in 1974, 1979, 1984, 1990, 1995, 2000, 2005, and 2010. (Andrae Decl. ¶ 26; Knapp Decl. ¶ 24; Anderson Decl. ¶ 33; Witt Decl. ¶ 40.)

67. Following each safety inspection, the third party safety inspector generates a report detailing its findings and recommending specific courses of action, then submits the report to CWPCo and to the federal regulators. (Andrae Decl. ¶ 26, Exhs. D, E, F, and G; Knapp Decl. ¶ 24, Exhs. B and C; Anderson Decl. ¶ 33, Exhs. B and C.)

68. Consistent with and as required by its FERC license, CWPCo allows public access to the dike and shoreline on the Property. (Andrae Decl. ¶ 6, Exh. B at 4-5; Witt Decl. ¶ 7, Exh. C at 9.)

MADI_2497075

69. A gravel road running along the top of the dike is used both for the Project and as part of the City of Stevens Point's Green Circle Trail. (Anderson Decl. ¶ 26; Witt Decl. ¶¶ 19-23.)

70. The gravel road was used for years in connection with the Project, specifically by CWPCo personnel conducting maintenance and inspections on the dike and ditch. (Andrae Decl. ¶ 13; Knapp Decl. ¶ 16; Anderson Decl. ¶ 26.)

71. In 2001, CWPCo granted the City of Stevens Point an easement to include the gravel road on top of the dike as part of the Green Circle Trail, which the public uses for biking, jogging, and cross-country skiing. (Witt Decl. ¶ 19, Exh. D; Anderson Decl. ¶ 25.)

72. The easement crosses both the Moodie Parcel and the Anonymous Parcel. (Witt Decl. ¶¶ 20, 24, Exh. E; Anderson Decl. ¶¶ 25, 26.)

73. The Trail is lined with crushed red granite to facilitate the public's use of the trail for jogging, biking, cross-country skiing and other activities. (Witt Decl. ¶ 21.)

74. CWPCo posted a sign at the entrance to the Trail on West Clark Street, where the Trail first connects with the dike, declaring the Trail open to the public. (*Id.* ¶¶ 25, 26, Exh. F.)

75. The public uses the Trail for recreation year-round and at all times of day. (*Id.* ¶ 27.)

76. CWPCo maintains the Trail in conjunction with the City of Stevens Point so that the Trail will remain suitable for recreational activities. (*Id.* ¶ 22; Anderson Decl. ¶ 28.)

77. CWPCo has allowed the public to cross the Property on the Green Circle Trail since the easement was granted while maintaining its right to run its own equipment and vehicles on the easement. (Anderson Decl. ¶ 25; Witt Decl. ¶¶ 19-23, Exh. D.)

MADI_2497075

78. CWPCo never sought permission from Moodie, the Unknown Others, or anyone else to grant the easement to the City or allow public access. (Anderson Decl. ¶ 27.)

79. Other than this public right of way, CWPCo has had exclusive use of the Property since before 1951. (Andrae Decl. ¶¶ 27-31; Knapp Decl. ¶ 25-29; Anderson Decl. ¶¶ 47-50; Witt Decl. ¶¶ 56-59.)

80. Throughout this time, CWPCo has treated the Property as if it were the exclusive owner. (Andrae Decl. ¶ 31; Knapp Decl. ¶ 29; Anderson Decl. ¶ 50; Witt Decl. ¶ 59.)

81. At no time has an adjacent landowner or any other party erected a permanent structure or enclosure on the Property, or otherwise interfered with Project operations on the Property. (Andrae Decl. ¶¶ 27, 29; Knapp Decl. ¶¶ 25, 27; Anderson Decl. ¶¶ 47, 49; Witt Decl. ¶¶ 56, 58.)

82. CWPCo has never sought or received permission from any predecessor to Moodie or the Unknown Others to use the dike and ditch on the Property. (Andrae Decl. ¶ 28; Knapp Decl. ¶ 26; Anderson Decl. ¶ 48; Witt Decl. ¶ 57.)

83. Except for Moodie's objections discussed in PFOFs 101-26, *infra*, no person or entity has objected to either CWPCo's use and ongoing maintenance of the dike or CWPCo's excavation, maintenance and use of the ditch. (Andrae Decl. ¶ 27; Knapp Decl. ¶ 25; Anderson Decl. ¶ 47; Witt Decl. ¶ 56.)

84. CWPCo's 1938 License, 1970 License, and 2003 License each recognize that the dike and ditch are Project works, *i.e.* physical structures included and necessary for the safe and efficient operation of the Project. (*See* Andrae Decl. ¶ 5, Exh. A at 1-2, ¶ 6, Exh. B at 2, 11-12; Witt Decl. ¶ 7, Exh. C at 2, 13-14 (all referring to the dike and "appurtenant facilities").)

MADI_2497075

85. The dike – including the riprap and Trail – and ditch cover almost all of the Property. (Witt Decl. ¶ 5.)

86. A very small portion of the Property is land submerged by the Project's impoundment. (*Id.*)

87. Each of the four permanent improvements – the dike, the riprap, the Trail, and the ditch – run approximately the length of the Property. (*Id.* ¶¶ 5, 16.)

88. Each of these four improvements have been permanently located on the Property in some form since before 1951. (Andrae Decl. ¶¶ 12-13, 17; Knapp Decl. ¶¶ 9, 13, 16; Anderson Decl. ¶ 12; Witt Decl. ¶¶ 10-11, 20.)

89. The Project could not operate properly or efficiently without either the dike or the ditch. (Andrae Decl. ¶ 11; Knapp Decl. ¶ 8; Anderson Decl. ¶ 11; Witt Decl. ¶ 10.)

90. Taking away the dike, the ditch, or both at any point in the Project, including at the Moodie Parcel or the Anonymous Parcel, would eliminate CWPCo's ability to maintain the Project's impoundment at the FERC required elevation, would cause flooding to adjacent upland property, and would severely frustrate many of the Project's purposes, including hydropower generation, public recreation, flood control, and fish and wildlife enhancement. (Witt Decl. ¶ 13.)

## CWPCO'S TITLE DISPUTE WITH MOODIE AND ITS INABILITY TO ACQUIRE THE PROPERTY BY CONTRACT OR PLEDGES

91. On November 8, 1929, CWPCo acquired the Property by warranty deed from Stevens Point Box & Lumber Company. (Lee Decl. ¶ 2; Exh. A.)

92. The Stevens Point Manufacturing Company ("SPMC") at one time owned record title to the Property. (*See id.* ¶ 3, Exh. B, ¶ 4, Exh. C.)

13

MADI_2497075

93. SPMC acquired title to the Property in two separate transactions: a September 18, 1885 conveyance from the estate of Jared N. Avery and a November 19, 1887 conveyance from William and Melanie Steffanus ("Steffanus"). (*Id.* ¶ 3, Exh. B, ¶ 4, Exh. C).

94. SPMC then quit-claimed to Steffanus a portion of the land it acquired in the 1885 sale on November 23, 1887. (*Id.* ¶ 5, Exh. D.)

95. On October 21, 1889, Steffanus conveyed certain real property, including the Moodie Parcel, to Nicholas and Catherine Jacobs. (*Id.* ¶ 6, Exh. E.)

96. In that deed, the legal description of the parcel that contains the Moodie Parcel begins on the southern edge of the right-of-way for Central Avenue, which is now West Clark Street. (*Id.*)

97. By contrast, the legal description in the predecessor deed by which the Stevens Point Manufacturing Company ("SPMC") acquired the Property begins at the center line of the road. (*Id.* ¶ 3, Exh. B.)

98. As a result of this inconsistency, the Steffanus-to-Jacobs deed erroneously extended the southeastern border of the property conveyed therein by approximately 30 feet, i.e. the distance between the middle of the road and the southern edge of the Clark Street right of way. (*Compare* Lee Decl. ¶ 3, Exh. B at 2, 3 *and* Lee Decl. ¶ 6, Exh. E.)

99. In a series of real estate transactions between 1998 and 2001, Moodie acquired five parcels of land once included within the property that Steffanus sold to Jacobs in 1889. (Answer, Dkt. 7, at 1-2.)

100. Moodie's land acquisitions totaled approximately five acres. (*Id.*)

101. Moodie claims that the Moodie Parcel was conveyed to him in the first of these transactions. (Answer at 1; *see also* Lee Decl. ¶ 7, Exh. F.)

MADI_2497075

102. He first made this claim to CWPCo during a meeting in March or April 1999 at which he presented his deed and survey map as evidence of his ownership. (Anderson Decl. ¶ 35.)

103. During this meeting, Moodie affirmatively stated that he believed he, not CWPCo, owned the Moodie Parcel and that he intended to construct a condominium complex on the land and develop the shoreline as a marina. (*Id*. ¶ 36.)

104. When Moodie first approached CWPCo in the Spring of 1999, CWPCo was involved in a dispute with another landowner claiming to own Project land. (Anderson Decl. ¶ 38.)

105. That dispute eventually led to litigation, in which CWPCo quieted title in its favor. (*Id*.)

106. Faced with Moodie's deed purporting to show yet another title dispute, and mindful of FERC's requirement that CWPCo own fee title to all Project lands or the right to use them in perpetuity, CWPCo offered to quit claim non-Project land to Moodie and grant him dock permits and ingress-easement rights on the Property's dike if Moodie would quit claim the Moodie Parcel to CWPCo. (*Id*. ¶¶ 39, 40, Exh. D.)

107. CWPCo also informed Moodie that FERC was unlikely to allow him to develop a marina off the dike. (*Id*. ¶ 37.)

108. Moodie rejected CWPCo's offer, but took no steps to eject CWPCo from, or restrict its access to, the Moodie Parcel. (*Id*. ¶ 41.)

109. In 2007, CWPCo discovered that Moodie was moving forward to develop both his land and the Property. (Anderson Decl. ¶ 42.)

15

110. CWPCo immediately informed Moodie that it owned the Moodie Parcel, that the Property contained essential components of the Project, and that it would resort to legal action if necessary to prevent Moodie from developing the Moodie Parcel. (*Id*. ¶¶ 43, Exhs. E, G.)

111. CWPCo again offered to swap land with Moodie and grant him dock rights and water access over the dike. (*Id*.)

112. Moodie again refused. (*Id*. ¶ 44, Ex. F.)

113. Moodie never developed the Property. (*Id*. ¶ 45.)

114. On July 17, 2009, following extensive negotiations, CWPCo offered to purchase the Moodie Parcel for $60,000.00. (Witt. Decl. ¶ 46, Exh. J.)

115. As an alternative, CWPCo offered to purchase easement rights in the Moodie Parcel for $12,000.00. (*Id*.)

116. Moodie rejected both offers. (*Id*. ¶ 47.)

117. In a September 15, 2009 letter to CWPCo, Moodie made a counteroffer to either, (a) sell CWPCo all five of his acres, including the Moodie Parcel, for $1,600,000.00; (b) exchange the five acres for land or property of equal value; (c) sell CWPCo the .4 acre Moodie Parcel for $1,080,000.00; or (d) lease the Moodie Parcel for $6,000.00 per month, to be adjusted upward to account for "cost of living" increases. (Witt Decl. ¶ 48, Exh. K.)

118. Moodie's letter also stated that CWPCo "must seek permission from me before you enter my land," even to perform maintenance. (*Id*.)

119. Moodie did not enclose an appraisal supporting his valuation of the land. (*Id*. ¶ 50.)

MADI_2497075

120. Moodie's September 15, 2009 letter was the first time that anyone attempted to bar CWPCo's entry upon or use of the Property. (Andrae Decl. ¶ 27; Knapp Decl. ¶ 25; Anderson Decl. ¶ 47; Witt Decl. ¶ 49.)

121. Notwithstanding Moodie's demands, CWPCo has continued to enter upon and use the Property, including the Moodie Parcel, to operate the Project. (Witt Decl. ¶ 55; Amendment to Answer, Dkt. 9, at 1.)

122. The Moodie Parcel is the only land to which Moodie claims ownership that is necessary to the operation of the Project. (Witt Decl. ¶ 54.)

123. The prices Moodie asked CWPCo to pay in his September 15, 2009 letter far exceeded what CWPCo believed to be fair market value for the Moodie Parcel. (*Id.* ¶ 51.)

124. CWPCo rejected each of Moodie's counteroffers. (*Id.* ¶ 50.)

125. For over five decades, CWPCo used and maintained the Property in furtherance of the Project without any challenges to its title or ownership. (Andrae Decl. ¶ 30; Knapp Decl. ¶ 28.)

126. CWPCo never had reason to doubt its title to the Property until 1999, when Moodie first presented to CWPCo his deed as evidence of ownership. (Anderson Decl. ¶ 35.)

### CWPCO'S PRESCRIPTIVE RIGHTS IN THE PROPERTY

127. CWPCo holds the right to use the Property to advance the purposes of the Project, including for environmental protection and for public recreational use. (Andrae Decl. ¶ 5, Exh. A at 3, 10, 17, ¶ 6, Exh. B at 17, 18; Witt Decl. ¶ 7 Exh. C at 15 (incorporating F.P.C. Form L-5), ¶ 60.)

128. CWPCo holds the right to clear and dispose of "all temporary structures, unused timber, brush, refuse, or other materials unnecessary for the purposes of the [P]roject

17

MADI_2497075

which result from maintenance, operation, or alteration of the [P]roject works" on the Property. (Witt Decl. ¶ 7, Exh. C at 15.)

129. CWPCo holds the right to allow or prohibit non-Project activities on the Property. (Andrae Decl. ¶ 5, Exh. A at 7-8, 10-11, ¶ 6, Exh. B at 17; Witt Decl. ¶ 7 Exh. C at 21-24, ¶ 60.)

130. CWPCo holds the right to grant easements across the Property, as it did to the City of Stevens Point. (Andrae Decl. ¶ 5, Exh. A at 10-11, ¶ 6, Exh. B at 21; Witt Decl. ¶ 7, Exh. C at 21-24, ¶ 19, Exh. D, ¶ 60.)

131. CWPCo holds the right to prohibit outside parties from erecting structures on, excavating, or otherwise developing the Property. (Andrae Decl. ¶ 5, Exh. A at 7-8, ¶ 6, Exh. B at 23; Witt Decl. ¶ 7 Exh. C at 21-24, ¶ 60.)

132. CWPCo holds the right to grant or prohibit shore access on the Property by adjacent landowners. (Andrae Decl. ¶ 5, Exh. A at 10-11, ¶ 6, Exh. B at 23; Witt Decl. ¶ 7, Exh. C at 21-24, ¶ 60.)

133. CWPCo holds the right to open the Property to use by the public without notice to or permission from any servient estate owner. (Anderson Decl. ¶ 27; Witt Decl. ¶ 7, Exh. C at 9, 13.)

134. CWPCo holds the right to access the Property for Project-related purposes without notice to or permission from any servient estate owner, including to inspect, perform maintenance on, and improve the Property as necessary. (Andrae Decl. ¶¶ 14-19, 28; Knapp Decl. ¶¶ 10-16, 26; Anderson Decl. ¶¶ 13-24, 28; Witt Decl. ¶¶ 14-18, 22-23, 28-31, 55, 57.)

18

| | |
|---|---|
| Dated: January 3, 2011. | Respectfully submitted, |

/s/ Allen A. Arntsen
Allen A. Arntsen, WI Bar No. 1015038
Douglas B. Clark, WI Bar No. 1003658
Matthew D. Lee, WI Bar No. 1061375
**FOLEY & LARDNER LLP**
Verex Plaza
150 East Gilman Street
Madison, WI 53703-1481
Post Office Box 1497
Madison, WI 53701-1497
608.257.5035 (Telephone)
608.258.4258 (Facsimile)

*Attorneys for Plaintiff Consolidated Water Power Company*

19